UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

John Dabilis, as Parent and
Next Friend of Thomas Dabilis

    v.                                    Civil No. 14-cv-371-JD
                                          Opinion No. 2017 DNH 059
Hillsborough County, et al.


                         O R D E R


     John Dabilis brought federal civil rights claims and state
law claims against Hillsborough County and corrections officers
at the Hillsborough County Jail, arising from events that
occurred when Dabilis's son, Thomas Dabilis, was detained at the
jail.  In response to the defendants' motions for summary
judgment, Dabilis objects only to summary judgment on his claim
against Hillsborough County under the Americans with
Disabilities Act ("ADA") and the Rehabilitation Act ("RA"),
Count III.[1]  Because Dabilis does not oppose summary judgment on
the other claims, which are alleged in Counts I, II, IV, V, VI,
and VII of the complaint, those claims are dismissed.


                    Standard of Review

     Summary judgment is appropriate when the moving party
"shows that there is no genuine dispute as to any material fact

_____

     [1] The defendants asked to have a hearing on their motions but
did not comply with the requirements of Local Rule 7.1(d).  No
hearing was held.

and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a
reasonable fact-finder could resolve in favor of either party
and a material fact is one that could affect the outcome of the
case."  Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir.
2015).  Reasonable inferences are taken in the light most
favorable to the nonmoving party, but unsupported speculation
and evidence that "is less than significantly probative" are not
sufficient to avoid summary judgment.  Planadeball v. Wyndham
Vacation Resorts, Inc., 793 F.3d 169, 174 (1st Cir. 2015)
(internal quotation marks omitted).

### Background

Under the local rules of this district, a party moving for
summary judgment must "incorporate a short and concise statement
of material facts, supported by appropriate record citations, as
to which the moving party contends there is no genuine issue to
be tried."  LR 56.1(a).  In response, a party opposing summary
judgment must "incorporate a short and concise statement of
material facts, supported by appropriate record citations, as to
which the adverse party contends a genuine dispute exists so as
to require a trial."  LR. 56.1(b).  "All properly supported
material facts set forth in the moving party's factual statement

may be deemed admitted unless properly opposed by the adverse party."  Id.

Hillsborough County did not incorporate a factual statement in its memorandum in support of its motion for summary judgment, as required under the local rules.  Instead, Hillsborough County incorporated by reference the factual statement provided in support of a separate motion for summary judgment that was filed by the individual defendants.[2]  Dabilis did not object to the nonconforming memorandum provided by Hillsborough County and did not provide a factual statement in opposition to either motion for summary judgment.  Therefore, Dabilis is deemed to have admitted the properly supported facts in Hillsborough County's "incorporated" statement of facts.

Thomas Dabilis was arrested by Nashua police during the evening of July 29, 2013, and was taken to Hillsborough County Jail for booking as a pre-trial detainee.[3]  Because of Thomas's behavior during booking, he was "flagged" and was seen by Nurse Martin.  Martin consulted by telephone with a mental health clinician, Christine Mellnick, and placed Thomas on fifteen

---

[2] Adding the incorporated factual statement, Hillsborough County's memorandum violates the page limit, and Hillsborough County did not seek leave to file a longer memorandum.  LR 7.1(a).

[3] As is noted above, Thomas Dabilis is the son of the plaintiff, John Dabilis.  The court will refer to him as Thomas.

minute behavioral watches for his safety.  Martin also recorded
Thomas's medical history.

Thomas was placed into a cell on unit 2-A at about 2:40
a.m.[4]  During his rounds, Officer George Zarzycki saw that Thomas
was sliding his legs out under the door of his cell and asking
for help.  At 8:10 a.m., Thomas asked to speak with a nurse.
Nurse Lynda Wheeler was informed about Thomas's erratic
behavior, odd comments, statements suggesting self harm, and the
behavioral watch.  Officer Todd Gardner wrote on the watch
sheets that Thomas was not making sense and was talking to
people who were not there.

Nurse Wheeler went to Thomas's cell.  During their
interaction, Thomas made statements about killing himself.
Nurse Wheeler decided that he required a more intensive watch,
called a "special watch," and should be changed into a safety
smock to avoid risks of hanging.

To accomplish Nurse Wheeler's directives, the staff had to
change Thomas's clothes and move him to a different cell.  When
the officers came to Thomas's cell, he told them that he was
frozen and could not comply with their order to come to the cell

---

[4] Superintendent David Dionne states in his affidavit that
because of privacy laws corrections officers are not informed of
any mental health diagnosis for an inmate but instead are
required to monitor the inmate's behavior and to respond to the
behavior if it threatens the safety or health of the inmate,
another inmate, or the staff.

door.  The officers opened the cell door and spayed Thomas with
"OC" (which is commonly referred to as pepper spray) to
disorient him while they went in and secured him.  Thomas,
however, charged the door, tried to grab the OC canister, and
tried to get out of the cell.  In the process, Thomas punched
the officers and staff, struck his forehead on the concrete
floor, and tried to get underneath his bunk.

After a prolonged struggle, the officers were able to get
Thomas into restraints.  Thomas said he would walk on his own
with the escort down the hallway.  When they were in the
stairway, however, Thomas went limp and threw himself forward.
The officers were able to prevent him from falling.

Based on the shift commander's order, Thomas was taken to
another housing unit and put into a restraint chair.  Nurse
Denise Ryan arrived to treat Thomas's face wounds sustained
during the struggle with officers in his cell.  Thomas was
transported to Elliot Hospital for treatment.  While in the
hospital, Thomas tried to take the gun of the officer on duty,
which required him to be placed in additional restraints.

Because of his behavior, Thomas was assessed by mental
health providers, including Dr. Quentin Turnbull, a psychiatrist
with Manchester Mental Health.  The purpose of the assessment
was to determine whether Thomas should be transferred to the
Secure Psychiatric Unit.  Before that determination was made,

Thomas's father, John Dabilis, posted his bail early on August 1, and Thomas was released from custody.

Thomas was eventually found to be incompetent to stand trial on the assault charges that had resulted in his detention at the Hillsborough County Jail.  As a result, the charges were dismissed.  John Dabilis serves as the guardian for Thomas.

<u>Discussion</u>

John Dabilis, on behalf of Thomas, brought a claim, alleging that Hillsborough County failed to provide reasonable accommodation for Thomas's mental illness disability in violation of the ADA and the RA.  Hillsborough County moves for summary judgment.[5]  In support, Hillsborough County argues that Dabilis cannot show that Thomas was a qualified individual with a disability for purposes of the ADA and RA and that the claim under the ADA and RA cannot be based on the denial of medical or mental health treatment or on use of a restraint chair.

In his objection to summary judgment, Dabilis clarifies his claim under the ADA and RA.  He contends that Hillsborough

---

[5] Hillsborough County moves for summary judgment but appears to confuse that standard with the standard for a motion to dismiss.  A motion for summary judgment under Federal Rule of Civil Procedure 56(a) addresses the proof available to support a claim or to support defenses to the claim.  The complaint is not at issue.  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of allegations in a complaint.

County, through its employees and officers, knew that his son was mentally ill and that Hillsborough County was obligated to provide a reasonable accommodation for his illness.  Dabilis contends that Hillsborough County was required by the ADA and RA to modify their usual policies and procedures for cell extractions in order to accommodate Thomas's obvious mental illness.  Dabilis suggests, as a reasonable accommodation, that the extraction could have been delayed and a mental health professional could have been called to deal with his son.

The ADA is comprised of sub-parts, Titles, which apply to different entities and claims.  See, e.g., Hagenah v. Comty. Enters., Inc., 2016 WL 1170963, at *3 (D. Mass. Mar. 23, 2016). Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The RA also bars discrimination based on a disability.  29 U.S.C. § 794.  Liability under the ADA and the RA is based on the same standard, so that the claims may be considered together.  Nunes v. Mass. Dep't Corrs., 766 F.3d 136, 144 (1st Cir. 2014). Prisons are subject to the ADA and RA.  Id.; Reaves v. Dep't of Corrs., 191 F. Supp. 3d 383, 418 (D. Mass. 2016).

To prove a claim of discrimination under Title II of the ADA and the RA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he was discriminated against; and (3) the discrimination was by reason of his disability. Buchanan v. Maine, 469 F.3d 158, 170-71 (2006).  The ADA does not require that services be provided to the disabled but instead prohibits discrimination against disabled persons as to services that are available generally.  Id. at 174.

A.  Qualified Individual with a Disability

A qualified individual with a disability is someone "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). "Disability" is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  A plaintiff must show either that he had a particular disability, that he had a record of the disability, or that he was regarded as having that disability.  42 U.S.C. § 12102(1).

Dabilis provides no evidence that Thomas had a "disability" within the meaning of the ADA.  Dabilis did not submit medical records, medical opinions, or any other evidence to show the nature of Thomas's mental illness while he was detained at Hillsborough County Jail.  Instead, Dabilis argues that everyone at the jail knew that Thomas was mentally ill.  In support, Thomas cites the officers' knowledge of Thomas's erratic behavior and the watches established by the jail to monitor him.

Medical staff evaluated Thomas and determined that he required additional measures to address his behavior and to protect him from self-inflicted harm.  Dabilis has not shown, however, that the medical officers or corrections officers knew that Thomas had a specific mental illness or that his mental illness would prevent him from cooperating in the cell extraction process.  As such, Dabilis has not shown that Thomas had a disability within the meaning of Title II.

With respect to being a qualified individual, Dabilis provides no evidence that Thomas could have participated in the activity, extraction from the cell, with the proposed accommodation.  In other words, Dabilis provides no evidence that given Thomas's particular mental illness he would have been cooperative if given extra time or if a mental health

professional had been involved in the process.[6]  In fact,
Thomas's behavior at the hospital suggests that extra time would
not have changed the outcome.  Therefore, Dabilis has not shown
that Thomas was a qualified individual with a disability when he
was extracted from his cell.

B.  Discrimination

     Even if Dabilis could raise a triable issue as to whether
Thomas was a qualified individual with a disability for purposes
of the ADA and the RA, Dabilis has not properly supported his
claim of discrimination by reason of Thomas's disability.[7]
Disability discrimination claims under Title II may arise in
different contexts, which are disparate treatment,
discrimination due to the effect of a facially neutral policy,
and failure to accommodate a known disability to allow access to
a public service.  Nunes, 766 F.3d at 144.  Under Title II,
jails are required to "'make reasonable modifications in
policies, practices or procedures when the modifications are
necessary to avoid discrimination on the basis of disability,

---

     [6] Dabilis explicitly disavows any claim that Thomas received
poor treatment for his mental illness and that he was denied
access to a program because of his mental illness.

     [7] In his objection to summary judgment, Dabilis argued that
Hillsborough County misunderstood the ADA and RA claim and as a
result focused the motion for summary judgment on issues that
were not raised in the claim.  In its reply, Hillsborough County
focused on the claim, as clarified in Dabilis's objection.

unless the [jail] can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'"[8] Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 283 (1st Cir. 2006) (quoting 28 C.F.R. § 35.130(b)(7)).

The requirements of a "qualified individual" and a "reasonable accommodation" are interrelated.  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012). Reasonable accommodations are modifications or adjustments to the environment or the methods of performance that enable the disabled person to function as required and that are not unduly burdensome.  See Murray v. Warren Pumps, LLC, 821 F.3d 77, 84 (1st Cir. 2016) (discussing reasonable accommodation in Title I context); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (same); see also Baxter v. Penn. Dep't Corrs., 2016 WL 1165977, at *5 (W.D. Pa. Mar. 7, 2016) (analogizing standard to context of disabled inmate's access to prison training).  The need for an accommodation must be

---

[8] A claim for discrimination under the ADA and RA may arise when corrections officers discipline an inmate who is disabled due to mental illness in the same way they would discipline a non-disabled inmate, when the inmate's conduct was caused by his mental illness.  See Snider v. Motter, 2016 WL 4154927, at *8 (M.D. Pa. June 2, 2016).  On the other hand, however, arresting officers do not violate the ADA by responding to a call and arresting a mentally ill person without waiting for personnel trained to deal with mentally ill individuals.  See Vila v. Miami-Dade County, 65 F. Supp. 3d 1371, 1383-84 (S.D. Fl. 2014).

triggered by a request, unless the need is obvious.  Kiman, 451 F.3d at 283.

Dabilis agrees that the officers followed their usual practices and procedures in removing Thomas from his cell.  He does not contend that Thomas asked for extra time or for a mental health professional before being removed from his cell. Dabilis also does not contend that the officers knew that Thomas required a modified process because of his mental illness. Instead, Dabilis argues that the officers should have modified their usual practices and procedures for cell extraction because of Thomas's obvious mental illness and that their failure to do so was discriminatory.

In support, Dabilis cites generally the opinions provided by his expert witness, Ron McAndrew.  McAndrew's opinions are based on his work for twenty-three years as a corrections officer and supervisor at prisons in Florida.  McAndrew is not a mental health professional.

McAndrew states that in his opinion it was obvious to the officers that Thomas "was engaged in strange behavior, visibly confused, communicating with difficulty while continuously stating 'I'm Frozen,' and exhibiting an anxious mood disorder, signs of mania or depression, . . . recognizable to a trained corrections officer."  Doc. 28-1, § VIII, ¶ 2.  McAndrew faults the officers because "the patience required in dealing with such

detainees was not afforded [Thomas] by the [supervising officer]."  McAndrew then states, however, that corrections officers are not trained to diagnose mental illness.

To the extent McAndrew suggests that the officers did or should have diagnosed Thomas's strange behavior as a particular mental illness, he contradicts that suggestion by his statement that corrections officers are not trained to diagnose mental illness.  The medical personnel at the jail, who interacted with Thomas, ordered that Thomas be clothed in a safety smock and moved to another cell for his own safety because of his behavior.  The officers were following that order in extracting Thomas from his cell.

It is undisputed in this case that the corrections officers were not told that Thomas was mentally ill, that he had any particular diagnosis, or that he needed any modification in the normal process and procedures for cell extraction.  While McAndrew states that the officers should have used extra patience in dealing with Thomas, he does not suggest that the officers should have called a mental health professional before extracting Thomas from the cell and expresses no opinion that extra patience would have changed the outcome of the cell extraction.  Dabilis provides no evidence to show that the

13

officers should have crafted a different extraction process based on the little they knew about Thomas's condition.[9]

Dabilis cites Higgins, 194 F.3d at 264, to support his claim that a defendant may be required to make an exception to its neutral policy in order to provide a reasonable accommodation.  In Higgins, the plaintiff brought a claim of discrimination under Title I of the ADA against his employer, among other claims.  The alleged discrimination was Higgin's employer's failure to provide him with reasonable accommodation for his hearing loss.  Id. at 263-64.  The court did not discuss an ADA requirement for an employer to make an exception to a neutral policy.  Instead, the court reversed summary judgment because the district court erroneously required a showing of intent to discriminate.  Id. at 265.

Higgins does not appear to provide any guidance in this case.  Dabilis provides no argument or analysis to show how Higgins supports his Title II claim, and the court will not speculate as to what connection Dabilis may have intended to make between Higgins and this case.  See Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010); Higgins, 194 F.3d at 260 ("A party who aspires to oppose a summary judgment motion

---

[9] It is also important to note that Thomas was being moved to a different cell for his own safety because of his odd behavior and comments about harming himself.

must spell out his arguments squarely and distinctly, or else forever hold his peace. . . .  The district court is free to disregard arguments that are not adequately developed . . . .")

Dabilis has not shown a factual dispute about whether Thomas's alleged need for extra time and the assistance of a mental health professional was obvious to the jail officers who were trying to remove him from his cell.  In the absence of evidence that Thomas was a qualified individual with a disability under the ADA, that the need for accommodation was obvious, and that the accommodation argued here would have allowed Thomas to function appropriately during the cell extraction process, Dabilis has not shown a triable issue to support his ADA and RA claim.

## Conclusion

For the foregoing reasons, the defendants' motions for summary judgment (documents no. 21 and 22) are granted.  All claims are resolved in the defendants' favor.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph DiClerico, Jr.
United States District Judge

March 23, 2017
cc:  John A. Curran, Esq.
     Lawrence A. Vogelman, Esq.

15